I would ask if anyone is having any difficulty, give us some kind of signal and we will certainly address because we're gathering together to hear you and to have an opportunity for you to hear our questions for you. So we begin our session this morning with Fischer v. Governor of New Jersey and Smith v. New Jersey Education Association. Appellate numbers 19-3914 and 19-3995. We've been advised that for each side there are two advocates who intend to address the court and we'll hear from counsel for the Fischer appellant first. That'll be granted. So the issue in this case is whether teachers who resign their union membership and object to dues deductions can be compelled to continue to pay for union speech until an escape period is satisfied, which is a mere 10 days. I submit this violates the teacher's First Amendment rights under Janus to refrain from subsidizing a union speech, at least unless there's clear and compelling evidence that these teachers knowingly, voluntarily and intelligently waived their First Amendment right to stop subsidizing the union speech until the escape period. Can we can we direct your attention to the 10 day notice requirement of the state statute for a moment? Based on the record, it appears that the NJEA did not do what the with the Township of Ocean. I apologize for the interruption. Go ahead, Mr. Kane. I don't see Judge Fischer. Yeah, I apologize. We seem to have lost Judge Fischer. Yeah, okay. Well, certainly. Well, certainly hold the clock, please. I apologize. No problem. We'll hold the clock. And Mr. Messenger, I'll give you the whole question when Judge Fischer joins. Thank you. You're welcome. Excuse me, Your Honor. Well, while we're paused, I would just know that I on my end, I'm having a lot of difficulty hearing Mr. Messenger. I don't know if I'm the only one who has that issue. I see some noddings of heads. Mr. Messenger, are you near your microphone and whatever device you're speaking to? Okay. We're just asking you to pretend like we're in the well of the courtroom. Dig deep. I will speak up. All righty. Can you hear me? We got you, Cal. Okay, I'm going to bring him here. One minute. Okay. Okay, Judge. I returned to a different venue. All right. I'm now within about 30 feet of Judge Phipps instead of 60. Outstanding. We can get as close as six, Mike. Yeah, I know. We got a few more feet to go. Yeah. Okay. Okay. What I'd like to do is let the clock go back to the beginning. Mr. Messenger had made some opening remarks before I asked a question. So, Mr. Cain, is that okay? We can go back to it. We'll just reset the clock. He had split the time. Correct. Yes, no problem, Judge. I have changed the clock. Okay, great. All right. Then we will proceed with the question that I was putting to Mr. Messenger. I wanted to focus you, if I could, on the statute and the 10-day period for a moment. The evidence in the record indicates that the Township of Ocean Board of Education had said that it was going to withdraw the 10-day period, but the NJEA, for its part, said that it respected and processed the Fisher Plaintiff's revocation notices in July of 2018. So, as a result, the 10-day notice wasn't imposed upon them. What is your response to that? Or are you withdrawing your challenge to the 10-day period since it wasn't enforced against them? I'm currently not withdrawing, Your Honor. The Township certainly enforced the 10-day period against the plaintiffs, I'm sorry, the appellant teachers. It's disputed whether or not the New Jersey Education Association did. What evidence disputes that, though, Counsel? And by the way, the Township's not a party to this action. So, what evidence do you have that the NJEA did? The NJEA never informed the appellant teachers that it was honoring their that union dues were taken until 30 days after their anniversary date, as required by the statute. So, it's undisputed the 30-day effective date for revocations under the statute was enforced against the appellant teachers. And therefore, with respect to that, though, the 30-day period, as applied to them, they had a contract, and that contract had two revocation periods, and then the statute that you challenged had a third period. If there was no statute, they would have had to wait longer. So, how were they injured by the statute? Differently, didn't the statute help them? No, because it was unconstitutional under Janus to take their money after they resigned and objected in July of 2018. So, it would have been unconstitutional to take their money until the escape period, the due seduction card. Any other judges here, Mr. Messinger? Can you speak a little louder? I can barely hear you. I apologize, Your Honor. What I'm saying, Your Honor, it's the appellant teacher's position that it's unconstitutional to take their money under Janus after they resigned and objected in July of 2018. What authority do you have to say that their contractual obligations become nullified as a result of a change in decisional law? Because that due seduction agreement, Your Honor, even if it's a contract, doesn't amount to a knowing, voluntary, or intelligent waiver of their First Amendment rights under Janus. They exercised their rights under Janus in July by resigning their union membership and telling the township, stop deducting union dues. The proposition that they could be held until January 1st under their due seduction card would require proof that that was actually a knowing, voluntary, and intelligent waiver of their rights under Janus to stop subsidizing the union speech. But if we were to conclude that the contractual obligation to pay is unchanged by a change in decisional law, there'd be no violation of the First Amendment, therefore nothing to waive, correct? Well, for purposes of the standing, the court has to assume that the plaintiff's legal claims are valid. And so if one assumes that plaintiff's legal claims that it was unconstitutional to take their money after they resigned and objected is in fact correct and they were injured under the statute because the statute resulted in them having union dues taken from them for a month. But their contract would have resulted in from having their dues taken longer, correct? But it would have been unconstitutional to continue to take their dues because that contract doesn't amount to a knowing and voluntary intelligent waiver of their rights. This court in telecommunications and in the DNC case made clear that a waiver of constitutional rights requires knowing, voluntary, and intelligent consent to such a requirement. Here there's no showing that the appellate teachers knew of their First Amendment rights or were intelligently deciding to waive them when they signed those dues deduction cards in the 1990s. And in fact, at the time they signed them, the Supreme Court yet even recognized their rights under Janus to subsidize any union speech. So the proposition that the dues deduction cards constituted a waiver of their right to stop paying union dues under Janus doesn't sort of satisfy this court's involuntary intelligent waiver test under Erie telecommunications or under the DNC case. So let me just see if I can trace back what your theory of standing is. As I understand it, one of the very first things that we looked at at standing is whether there has been an invasion of a legal right that has come through an injury in fact. And so we look to injury in fact, but we invasion of a legal right analysis later for the merits typically. But as I understand you defining what that legal right is that has been invaded, it really has two parts. One part is that you think you should get basically immediate repayment. Maybe that's too strong, but something close to immediate repayment. And then the second part is that you aren't bound by the membership application anymore. So your legal right has two themes to it. And what we're supposed to look at understanding is whether there has been under that definition of a legal right, whether there's been an injury in fact. Do I understand your legal theory, right? Or am I missing something that you need to put in context? Well, the legal theory, your honor, is that under Janus, the teachers have a first amendment right not to pay for union speech and therefore dues seized by the government and union after, especially after they resigned and objected, violate that right. And so after Susan Fisher and Jeannette Speck said, I resigned from the NJA, I don't want union dues deducted from me. Any deductions after that point violated their first amendment right. Money was taken from them to subsidize union speech over their objections. So the injury- But what about Judge Schwartz? I mean, that legal theory might not let you all the way there because that legal- Judge Schwartz says, yeah, fine. But you had a membership application that got you better treatment than otherwise. And so how exactly are you hurt by a statute? Because that proposition presumes that the membership agreement could hold the teachers from exercising their rights under Janus that constituted a waiver of their right under Janus to stop paying union dues immediately. So unless that membership report concludes that that dues deduction agreement constitutes a no involuntary intelligent waiver of their rights to stop paying union dues, they are not bound by it or at least by the escape period prescribed in it. Because at the end of the day, it's unconstitutional for the government and unions to take someone's money for union speech over their objections. And so the proposition that an individual waived their right to stop paying for union speech to a date certain, whether pursuant to a dues deduction agreement, pursuant to a statute, requires proof that that is in fact a waiver of their rights, which under Janus and this court's precedent requires clear and compelling evidence of a no involuntary intelligent waiver. And the membership or dues deduction agreement rather doesn't satisfy those requirements. It doesn't prove a no in waiver or an intelligent waiver of their rights. Because at the time, there's nothing on those forms that notifies the employees that they have first amendment right under Janus or in fact that they're waiving that right for a certain amount of time period. Mr. Messenger, I just want to ask Judge Fischer if he has any questions since we're over your time. You're allotted five minutes. Judge Fischer. It's hard to see the clock. That's okay. That's why I'm going to help you out. So apologies for the interruptions. Judge Fitz, do you have any further questions for counsel? No, thank you. Okay. We'll hear from Mr. Mitchell on behalf of the Smith plaintiffs. And according to the reservation of time, you have seven minutes. Thank you, Your Honors. May it please the court. I'd like to reserve two minutes for rebuttal if possible. The three issues presented on the standing counsel before you do that is my understanding that Mr. Messenger was reserved three minutes for everyone that we were told everyone. Okay, then that's fine. I'm sorry. No worries. The three issues presented on this appeal. The first is the question of standing or mootness, whether there's an article three justiciable case or controversy between the plaintiffs and the defendants over the constitutionality of section six of the Workplace Democracy Enhancement Act. The second question, which is related to the first, is whether our clients have contractually waived their rights to withhold payments from the union after resigning their union membership. We contend there was no contract at all in the first place because it's unsupported by consideration. But the contractual issue relates to the standing issues and the mootness questions for the reasons we've explained in our brief. The third question, which is discussed only briefly, is whether the plaintiffs are entitled to a refund of pre-Janus union payments. And that third question is largely foreclosed by this court's recent ruling in Diamond against Pennsylvania State Education Association. With the court's permission. If I could just ask you about that issue because I want to try to narrow who the parties are still in front of us. Do Plankton Smith and Hedenberg have any other claims or are their claims precluded by Diamond? Their claims are precluded by Diamond because they were agency fee payers. Okay. That's what I wanted to clarify to make sure that they fit in that box. And then with respect to certain defendants, it's my understanding that there has been no challenge to the orders dismissing the claims against the local school boards and the members of the New Jersey Public Employee Relations Commission. Am I correct? Yes, that's right. We're not on appeal. We believe the claims with respect to section six, the Workplace Democracy Enhancement Act are properly brought against the governor of New Jersey. And we've reached an understanding with the defendants. Understood. One final question just to narrow the field and then I'll let you continue, maybe. Do you only seek then post-Janus damages for members or people who tried to resign their membership? Yes, because to our knowledge, there's been no non-member who had wages diverted post-Janus because the unions complied with Janus. So yes, that's right, Your Honor. It could only be a member who tried to get out post-Janus and had trouble getting the payroll deductions to stop. So with respect to Article III standing, standing must be assessed at the moment the complaint is filed. Post-filing events may be relevant to mootness, but they have no bearing whatsoever on Article III standing. And there's no question that our clients in the Smith litigation had standing when they first joined this lawsuit. If we look at the time that plaintiffs Sandberg, Santiago, and Poulsen joined the case in early July, Janus had been decided. They were facing the prospect of having their wages tapped in September despite their recent resignations from union membership. And the threat of that continued diversion of their wages imposed injury in fact that allowed them to challenge the constitutionality of Section 6. What evidence do you have that there was a risk of such future enforcement? The text of the statute itself. You're saying purely because something's on the books is sufficient to give someone a threat of prosecution. That's your position? The statute has to be on the books, but if the statute's fallen into destitute and it's never enforced, Your Honor, then no, there would not be Article III standing. If it's something antiquated law that is not ever being enforced. So the mere existence of a statute is not going first and we're not going that far. But certainly this was a recently enacted statute that the state had every intention of enforcing. Only later after we filed our lawsuit did the New Jersey Education Association announce that it would not enforce the statute as written. That came later after we filed a lawsuit. So that development may be relevant to the mootness question, but it can't possibly destroy our client's standing. The standing has to be assessed by the world that existed on the moment the complaint was filed. Or if it's an amended complaint and a new plaintiff is joining at the moment the amended complaint was filed. So it's your position that if a book, if it's a new statute, even though it's only on the books and there's no evidence it's ever been enforced, that would give a party standing? If there's evidence, Your Honor, that the state has no intention of enforcing it and that's been somehow announced and it's public, then that could possibly defeat standing at a time the complaint is filed. But this happens all the time. A law is signed and people challenge it immediately the next day. You don't need to wait for some announcement that says we really are going to enforce the statute as written. That's something that's to be assumed unless there's evidence to show the contrary. Don't we have evidence in the record about the guidance from the NJEA? We do, but that guidance postdates our lawsuit. So the guidance that the NJEA issued came out in September of 2018 and that guidance specifically says that this guidance was issued in response to the Smith lawsuit that was filed. So again, the guidance can be relevant to whether the case is moot or whether some of our claims have become moot. But that guidance can't be relevant to the standing question because that guidance did not exist when plaintiffs Poulsen, Santiago, and Sandberg filed their lawsuit in July. Don't we have evidence just by way of example, Mr. Sandberg? I understand from the record there was an administrative error which led to the continued withdrawal, but they were acting to provide him the benefit. Isn't that evidence that they weren't enforcing the statute? So Mr. Sandberg's situation is somewhat complicated. He resigns from the union on June 28th or June 29th right after Janice comes out. So under the statute, under section six, he has to keep paying union dues until 30 days after his employment anniversary date and he has to remember to opt out again within that 10-day window described in the statute. So when Sandberg sued, he was facing the possibility that his paycheck would continue to be tapped. When the NJEA issued their guidance in September, they said we're going to change the regime. We're going to depart from what the statute actually says and we're going to impose our own regime where we'll allow payroll deductions to stop on July 1st or January 1st or 30 days after your employment anniversary date, whichever comes sooner. So for Sandberg, that should have been July 1st. His wages still were tapped in September. What do we do with the evidence that happens to be in the Fisher plaintiff's record that the NJEA accepted their efforts to revoke their July 8, 2018 revocation notice? Isn't that an indicia that nobody was seeking to enforce the 10-day period? I'm not as familiar with the facts of the Fisher case, but with respect to the NJEA, we know from the guidance document that they issued later, which came out in September, that they no longer have any intention of enforcing the statute as written. But again, Your Honor, this can only be relevant to the question of mootness because that guidance document was issued after we filed our lawsuit. We had standing at the time we filed because no guidance document existed at that time. And the plaintiffs were entitled to declaratory relief at the very least. They had standing to seek declaratory relief to make sure their rights would be protected despite a statute that is, even as a district court found, patently unconstitutional. So let me ask you this question. Let me just say, let's assume that this timing component of standing is satisfied here. And let's say that we're at mootness. So you've got problems with the guidance document. You say it's transitional, it's other stuff like this. Applies only to a transition period that's undefined. But was there any way that the NJEA could have mooted this suit? Could moot this lawsuit by something that they would do? Or is it your position that basically the lawsuit is, I don't know if this is a legal term, unmootable because there's nothing that the NJEA could ever do to moot this case? I don't believe there would be because anything the NJEA would do would be voluntary cessation. And normally voluntary cessation does not moot a lawsuit. There can be some circumstances, your honor, where voluntary cessation can moot the case if it's absolutely clear that the conduct that you've sued over could not be expected to be revived. So what if the NJEA said, this isn't a transitional document, this is forever? I don't believe that. Does their ability to amend that, do we have to account for their ability to amend their promise of forever? I mean, it seems like your mootness point is really an all or nothing proposition. But tell me what you think. Yeah, I don't think that's enough to moot the case. First, because it's not just the NJEA that's the defendant, it's also the governor of New Jersey. This is a state statute. And the NJEA doesn't get to decide what the statute means. That's for the state authorities to decide. And statutes normally mean what they say. If the New Jersey Supreme Court issues some authoritative construction, then obviously every court should defer to that. But the NJEA doesn't get Chevron deference in deciding what a statute means. And just because the NJEA is deciding to flout the statute doesn't mean that the state authorities won't tell the NJEA to start enforcing the statute as written. So we have to hear from what the governor's position is, and what the state officials position about this statute, not just the NJEA. Secondly, even if they purported to put out some document that says, this is permanent, we're always going to interpret the statute this way, that still isn't binding on the future, it's almost akin to trying to enact an unrepealable statute. If you say in the statute, the statute can never be repealed, that's not enforceable, you can't do that. It's the same with private entities, they can try to purport to say that something is permanent going forward, but they can't take away the ability of a future iteration of the NJEA. Can I just push on a factual scenario there? Let's just say that there's a union member who wishes to resign from the union. They resign from the union. The NJEA says, here's your dues immediately. We will flout the statute. Here's your dues immediately. That gets a lot closer to mootness because that member resigned. They aren't coming back into an agency fees or representation fees space ever again. They opted out. And so at least for that set of people, isn't there a decent mootness play or not? First, I think it depends on what the situation was when they filed their complaint. If at the moment they filed their complaint, there was the threat of future enforcement, because the statute said at the time, you have to keep paying dues. And it's before the guidance document comes out. And then the NJEA says, here, we're going to give you all your money back and let you out of the union. The first question is, are they accepting the money? So Mr. Sandberg was mailed a check. He hasn't accepted it. He hasn't cashed it. And Campbell Ewald says that you can't force a plaintiff to accept a check that's tendered if he's not willing to accept that. I think another interesting wrinkle, Your Honor, would be has this plaintiff sued as a class representative? So our clients have brought a class action lawsuit. So they're suing not only on behalf of themselves, but on behalf of others similarly situated. And Campbell Ewald against Gomez also says you can't really moot out a class claim by trying to make the lead plaintiff go away by cutting him a check that he refuses to accept. It's a pick-off. It's a pick-off. It's a pick-off stance. Pick-off move, right. That's right. Genesis Healthcare allows that in other contexts, but not in class action. Right. So there are a lot of interesting wrinkles with these hypotheticals you're offering, because I think we have to just find out more about the facts. Is it a class action for one thing? Do we have a Campbell Ewald problem if the union is trying to make the lead plaintiff go away by giving them money? And that's exactly what we have here. We've mentioned this in our brief. We think there's a big Campbell Ewald problem with the union's efforts to moot out this case by mailing a check to Mr. Sandberg, and then just stopping the payroll deductions in violation of the clear and unambiguous text of Section 6. Mr. Mitchell, I just want to ask if Judge Fischer has any questions he'd like to ask. Judge Fischer? I do not. Okay. Judge Phipps, do you have any others? No, thank you. Okay, because we have gone over your time, but thank you for your arguments. Thank you, Your Honor. Okay. We'll now turn it over to the appellees. And for the union, I understand it's going to go first. Yes, Your Honor. Thank you. Ramya Ravindran on behalf of the union appellees. I'm going to focus my argument on the union membership agreements, and then Mr. Apar from the State Attorney General's Office will address the constitutional challenge to the New Jersey statute. The district court here correctly found that the membership agreements that were signed by the Fischer appellants and the member appellants in Smith were valid enforceable contracts that authorized the collection of the union dues that are at issue in this lawsuit. The plaintiffs admitted that they understood by signing these agreements that they were authorizing membership in the union and the payment of union dues through payroll deduction, and those agreements expressly stated on their face that payroll deduction could be terminated only at specified times each year. Your adversary, if you're going to focus on the contract, makes a claim that the contracts don't waive the First Amendment rights. Does that mean the contract is void? And if it doesn't, why? So our opponents are citing Janus for the proposition that these membership agreements became void after that decision came out. A couple of responses to that. First, Janus never addressed the issue of Mr. Janus in that case. People who had opted in, who had taken affirmative steps to demonstrate that they wanted to be members of the union and had authorized the deduction of union dues from their wages. When the Supreme Court was discussing the concept of waiver in Janus, they were doing so in the context of people like Mr. Janus, who, unlike the plaintiffs here, had declined union membership, never entered into an agreement with the union, never agreed to pay any money to the waiver in that context, was looking at whether could somebody like Mr. Janus, who had not affirmatively opted out, could he, through silence or inaction, be deemed to have consented to pay? And the court said, no, that there has to be affirmative consent to pay. So can I just pick up on this? Because this is a big theme in terms of the notion that Janus dealt with non-members only, in this case, focuses on members in large part. But one of the things that struck me is really, as you think about an employee, when they've got a decision to make under the Abood regime, under the pre-Janus regime, they had a decision. They could either be a member, as I understand it, they could join and they could pay 100% union dues, or they could say, and they could pay 85% of dues in a representational fee capacity. That's how I understand it. You may know it better than I do. That might be too simple. But it was essentially those two choices. Now, it strikes me that when Janus comes along, Janus says, oh, that second choice, that 85% choice, that's unconstitutional. That choice isn't there. So it seems then that what we're looking at is employees who had a choice, but one of the options was unconstitutional. Is there any support in the law that says when you give someone a choice, so-called choice, between one option and an unconstitutional option, that that is knowing, voluntary, intelligent, a legitimate choice? Or is that truly like a false choice? Well, it's not a false choice, Your Honor. So the choice that the member plaintiffs here had, which exists both before and after Janus, was the choice between membership and non-membership. And all of these plaintiffs admit that they understood membership was optional. They were not required to join. The cost difference between the two obviously changed after Janus, that the choice of non-membership carried with it the representation fee at the time that these plaintiffs made their Janus. But that puts them no differently situated than, for example, the criminal defendant in the Brady case from the Supreme Court that's cited in our brief. He had a choice between accepting the plea agreement or going to trial and risking the possibility of the death penalty. Supreme Court later invalidates that death penalty statute. So in that sense, the other option that the one that he didn't take was an unconstitutional choice because it carried with it what the court later held was an unconstitutional penalty under the statute that existed at the time that was later invalidated by the Supreme Court. But the court said that does not make the choice involuntary because what you look at is under then-applicable law, was he correctly informed of the options that he had? And under then-applicable law, he was. The same is true here. Under the then-applicable law, which was the Supreme Court's controlling decision in Abood, the plaintiffs—and again, this is—the facts here are undisputed. The plaintiffs admit that they understood that they had an option between membership and non-membership. And it's also admitted on this factual record that they chose the option of membership in order to get the additional rights and benefits that came with membership. And the facts show that they received the benefit of that bargain. They received the membership rights. They received access to benefit programs. Many of these plaintiffs participated in those benefit programs over the years, which are only available to dues-paying members. They received the benefit that they wanted from selecting the option of payroll deduction, which is that they—as they described it in their words, it was a more convenient method of paying their membership dues. And they all admitted that they affirmatively checked the box on the membership form to select the option of payroll deduction. So these plaintiffs, on this factual record, they absolutely knew and understood what they were agreeing to. And there's no First Amendment violation in holding them to their end of the bargain. That's what the Ninth Circuit in the Belgao case just recently decided. And that's what, you know, this court in Coltec similarly addressed a situation where someone entered into a contract motivated by a statute, by a statutory requirement, that the Supreme Court later invalidated. And this court in Coltec rejected the argument that that later change in the law rendered the decision by the coal company in that case involuntary or invalid. Because what—and what the court focused on was the fact that they had received the benefit of their bargain. They had made a decision which, as this court put it, may have been improvident in hindsight. But at the time, they made that decision. They received consideration in exchange. They enjoyed the benefit of the bargain. The other party to the agreement relied on the commitment that the coal company had made. And the court rejected the argument that the coal company made, which is very similar to the argument here, that it would be unfair to hold us to this agreement and make payments that the Supreme Court has determined are unconstitutional. And this court said, no, that won't—that wouldn't be unfair, and it's not a penalty, because it was part of the mutual exchange supported by consideration that you entered into. And that's the same thing that happened here. The plaintiffs here acknowledge that they understood there were certain rights and benefits that were only available to them if they chose membership. And they—knowing that they had a choice between membership and non-membership, they chose membership because the difference in cost was worth it to them, those additional rights and benefits. And they enjoyed the benefit of that bargain, in some rights and benefits, for union membership. And in exchange, they committed to paying membership dues for a certain period of time. Janus never dealt with a contractual—someone who had made a contractual agreement to pay, and it never suggested that a contractual agreement to pay is insufficient to authorize the payment of membership dues. Counsel, I'd like to ask you a question about the facts. It was alluded—I alluded to it with Mr. Messenger. You argued that the 10-day notice requirement wasn't enforced against plaintiffs Fisher and Speck, and what you—but they've offered the position of the Ocean Board of Education. Does that create a factual dispute as to whether they have standing to challenge the 10-day requirement? If not, why not? So, two responses to that. First of all, the documents in the record where the response by the township contains in there that says, you have questions, contact the union about this. Nobody contacted that. That is evidence in the record. Neither of the appellants contacted the union to ask about what the policy is. And it also—it's not going to create a factual dispute because the fact of the matter is the 10-day window was never applied. That is a fact, and that is not disputed because the appellants submitted their resignations in July, and they were let out in September, which was the earliest date. They actually were—they actually—their dues deductions actually stopped earlier than they otherwise would have under the terms of the contract. The union provided them the benefit of the third opt-out date that the statute provided. And so, there is no evidence that the union applied a 10-day—there is no 10-day window—there's no window requirement provision at all in the membership agreement signed by all of these plaintiffs here. And there is no evidence in the record that a 10-day window was applied to anybody, let alone any of the plaintiffs here. Thank you. Judge Fisher, do you have any questions for counsel? I have none. Judge Phipps, any further? Yeah, just one question about that 10-day window in the application. Do you agree with your opposing counsel that on the date that the 10-day window had not been officially made? I don't. So, first of all, there's no 10—I think Your Honor said 10-day window in the application. The union membership application does not have— does not have a 10-day window in it. And I would point actually to the—so, the guidance documents that were issued actually specifically say in there that members who are wishing to terminate can and continue to be able to submit notification of their desire at any time during the year. So, there was no change in position. And there's no evidence that the union ever even—pre these guidance documents coming out—that the union had ever held anybody who was wishing to revoke their dues authorization to a 10-day window period. Okay. Thank you very much for your arguments. We'll hear from the counsel for the governor. Mr. Parr. Your Honor, may it please the Court, I am Deputy Attorney General Eric A. Parr, appearing on behalf of the state. Your Honors, the decisive question in this case is whether this Court has jurisdiction to hear appellant's challenge to the Workplace Democracy Enhancement Act, a statute that has never been applied to appellant's detriment. In fact, the record establishes that the WDEA actually benefited four of the six union member appellants by allowing them to stop paying dues earlier than their dues authorizations permitted. And as for the other two union member appellants, the WDEA has simply had no effect on their ability to terminate their dues deductions. My argument today rests on a simple truth. Appellants have never suffered an injury on account of the WDEA. And even if the WDEA had caused harm to the appellants, there is no longer any effective relief that this Court can grant. Appellant's challenge to the WDEA thus fails on jurisdictional grounds under both a standing and a mootness analysis. Now, I want to respond to Mr. Mitchell's argument earlier, this timing question and the distinction between standing and mootness. The fact is, whether we evaluate standing from the moment of filing or from the vantage point of today, the outcome is the same. Because at the moment of filing, neither the state nor the union appellees were holding union members to a 10-day revocation window, to the window embodied in the WDEA. Now, there's been a lot of talk about the NJEA's guidance document, that guidance document released in September of 2018. That guidance document only confirmed the existing practice, which was to give union members the benefit both of the revocation periods and the opt-out rights in their dues authorizations and the revocation period and the effective date in the WDEA. And therefore, there was never any Article III injury here. The state has never interpreted the WDEA in the more restrictive way in which appellants construe it. And the state has consistently held, Mr. Mitchell mentioned earlier that we need to hear the state's position on this issue. The state has consistently held, first in the District Court, now before this Court, that the WDEA is a statutory floor upon which unions and their members are entitled to build via contract. But if Your Honors have any misgivings about deciding this case on standing grounds, there is another equally compelling reason to dismiss this case on jurisdictional grounds, namely under a mootness analysis. These claims are moot for a couple of reasons, Your Honors. First, every appellant who has attempted to revoke his or her dues authorizations has by now done so successfully. And second, Your Honors, the Smith appellants invoked the Voluntary Cessation Doctrine. But the Voluntary Cessation Doctrine is completely an opposite here for a couple of reasons. Number one, as I mentioned earlier, there has not been any cessation here. Both the state and the union appellees have been consistent in applying the WDEA as a statutory floor, not as a statutory ceiling. And again, four of the six union appellants actually benefit by virtue of the union appellees and the state's application of the WDEA. With respect to the other two, the WDEA simply had no effect. And there's a second reason why the Voluntary Cessation Doctrine doesn't apply here, Your Honors, and that is that there is an exception to that that the challenged conduct is not going to occur. Now, of course, in this case, neither the state nor the union appellees ever engaged in the challenge, i.e. they never actually held union members to a tender revocation. But even if they have, at this juncture, both the state and the union appellees have argued repeatedly and consistently in litigation for an interpretation of the WDEA as a statutory floor upon which unions and their members are not eligible. Okay. You've been telling us, I think, about the floor, or you call it the floor, but some call it a third option, I guess, under these contracts for when they can revoke, correct? I'd like to ask you about the standing on the 30-day period. You contend that the plaintiffs cannot establish injury in fact, either because the 30 days didn't cause its injury or because it would not be redressable. But don't they still have to comply with their obligations? Or put differently, maybe you should tell me why they lack standing to challenge the 30-day period. Well, they lack standing to challenge the 30-day period, Your Honor, because they were bound by their dues authorizations to continue paying dues in the case of Santiago, Paulson, Fisher, and Speck until January 1st of 2019. And counsel for the union appellees has argued compellingly that those dues authorizations were valid and enforceable contracts. The union appellees application of the WDA allowed those four union appellants to escape those dues authorizations approximately three months earlier than they would have been permitted to under their dues authorizations. So you're saying that they're not injured because the existence of this option actually benefited them. That's correct, Your Honor. The fact is the dues authorizations, the fact is the dues authorizations as counsel for the union appellees just convincingly argued, survived the Janus decision. And the appellants in this case were bound by those authorizations to continue paying dues for a fixed period of time in exchange for the benefits of membership. As Judge Bond correctly held below, they were able on account of the WDEA to escape those authorizations earlier than they otherwise would have been able to. But as I said earlier, Your Honor, if the panel has any reservations about the side of this case on standing grounds, there is an equally compelling case on mootness grounds. There is at this point no effective relief that the court can grant. Every one of the appellants who has attempted to revoke his or her dues authorizations has done so successfully. The voluntary cessation doctrine is inapplicable. Number one, there was no cessation to begin with. And number two, there is an exception to the voluntary cessation doctrine for when it is abundantly clear that the challenge conduct will not recur. That exception absolutely applies here. And note the extremely attenuated chain of events that would have to take place for these claims not to be moved. The union member appellants would have to rejoin the union, reauthorize their dues deductions, and both the state and the union appellees would have to reverse their interpretation of the WDEA and begin enforcing the 10-day consideration. Let me ask Judge Phipps if he has any questions for you. No, thank you. Okay. Judge Fischer? None. Okay. Counsel, we thank you for your argument. Thank you, Your Honor. Okay. Mr. Messenger, you have three minutes for rebuttal. Thank you, Your Honor. Can everyone hear me? Okay, yes. Thank you, Your Honor. Two points. The first with respect to standing, it's undisputed that union dues were taken from appellants Fischer and Speck 30 days after their anniversary date, just as Section 6 of the WDEA requires. The statute was therefore enforced against them, and as a result, they suffered injury and facts sufficient to allow them to challenge the statute. And then second, going to Judge Phipps' question about whether individuals who signed dues deduction agreements prior to Janus, that could be considered voluntary and knowing, I'd suggest it be considered neither. Prior to Janus, employees had no choice but to support union speech. They could either support it with 100 percent dues or 85 percent dues, but they didn't have the option the Constitution required, which was not to subsidize union speech at all. I mean, to use the plea agreement analogy, it'd be as if a court told the defendant his only options were to plead guilty to one of two charges and pay a fine either way, but they didn't have the option to plead innocent and pay no fine. That is the situation here. The appellants were never given the right not to pay union dues. They had no choice but to pay them at the time they signed those dues deduction authorizations, and therefore they cannot be considered voluntary. And then with respect to knowing, individuals cannot waive a First Amendment right before that right is recognized. The Supreme Court recognized as much in Curtis Publishing v. Butts, which involved a First Amendment waiver, and the cases cited by the Union Council aren't to the contrary. In Brady, the individual knowingly pled guilty to the charge at which he was accused of, which was kidnapping. The only thing that changed was sentencing law. And in Mooseley, the court found that in a plea agreement context, if you're not informed of the essential charge against you, you can't knowingly or intelligently plead guilty to it. And that is the case here. Individuals presented only with the choice of paying for union speech, either as a right not to pay anything at all. And then in terms of Coltec, Coltec stands for the proposition that a contract may not be invalidated by a later change in the law. But in Coltec, the individual knew of the right. The individual, I'm sorry, the coal company had an existing legal claim challenging a certain statute. The company obviously knew that claim existed, and it decided to give up that claim in a settlement. So it's nothing like the situation here where the question is, can an individual waive a right they didn't even know existed and were never informed it were existing? Because nothing on the union's dues deduction forms notified employees they have a first amendment right under Janus not to pay union dues and that they were waiving that right. And without knowledge that they had a right not to pay union dues, those dues deduction agreements cannot be considered a knowing or intelligent waiver of their right to stop subsidizing union speech. Thank you. Thank you. Judge Phipps, do you have any questions for counsel? I mean, this is interesting, because you said they didn't know that they had the right. I mean, at the time, they didn't have the right. And Janus isn't retroactive, is it? Yes, Your Honor. Supreme Court decisions are retroactive under Harper and Reynoldsville casket. When the Supreme Court says what the Constitution requires, it has always required that. People were only under the misimpression prior to Janus that the Constitution allowed compulsory union fees. Your representation is the Supreme Court has held Janus is retroactive, or are you saying the Supreme Court in other cases have held holdings that have constitutional implications to be retroactive? The Supreme Court in Harper and then reiterated Reynoldsville casket held it. The Supreme Court's pronouncements on what the Constitution means are presumptively retroactive. Okay, but then the answer is no. The Supreme Court has not held Janus is retroactive. You're asking us to infer it was retroactive based upon its other pronouncements on other constitutional questions. Am I correct? Somewhat, Your Honor. I mean, the general rule is that Supreme Court constitutional decisions are retroactive. That's the rule. And so unless the Supreme Court said Janus is not retroactive, which is not what, there's nothing in Janus that Well, it doesn't matter here because everything here is we're only looking at damages after Janus, right? Well, it matters to some respect with respect to whether or not the individuals knowingly and intelligently waive their rights under Janus, or their first right not to subsidize union speech before Janus was decided. I understand. Your argument is somewhat contradictory to the decision of this court in Diamond. By arguing retroactivity, by arguing retroactivity, in effect, it seems to me you're making an argument that undermines the impact of court's decision in Diamond. Well, your opinion in Fisher, Your Honor, took the proposition that there's no retroactive liability under Section 1983. It doesn't stand for the proposition that Supreme Court decisions are not retroactive. That was Your Honor's intent. I did not read Your Honor's opinion that way. I'm not saying it was our intent. But what I said, it seems like your argument undermines what the opinion held. I don't necessarily believe so, Your Honor. But the Supreme Court says what the First Amendment means, that's what the First Amendment has always meant. You know, the court doesn't invent new rights. It doesn't create them. It just says what was there. The court said Abu was wrong, that the First Amendment permitted compulsory union fees. In fact, they were unlawful. Counsel, you brought a 1983 claim, right? Yes, Your Honor. And the Diamond decision was saying that for events that happened before Janice, there's no liability. There were two theories to get to that point, but there was no liability. No damage is liability, Your Honor, for different reasons. There were three opinions in the Diamond decision. Thank you. Judge Phipps, is there any further you'd like to ask counsel? I'm sorry to press this retroactivity point, but I'll go to the criminal space. You know Gideon B. Wainwright, the right of indigents under indigent criminal defendants to have Sixth Amendment right to counsel? Yeah, well, it was like four years later, five years later that the Supreme Court said, oh, that rule now applies retroactively. So, I mean, when I think about retroactive, I mean, at one level, maybe the Gideon rule always was the case. But the question is, isn't it a separate question as to whether to apply it? Otherwise, it escapes me the name of the case, it was four or five years later after Gideon, I apologize. But Gideon didn't just, it vindicated Gideon's rights, but it didn't, other people weren't sure and the Supreme Court had to say, oh, now this applies retroactively. I mean, don't we need something like that from the Supreme Court on Janice to kind of say that it applies, it may have always been the law, but if it's going to apply to people who didn't challenge it at the time, don't we need something more or not? Well, two points, Your Honor. The first is, I submitted again, Janice is retroactive, at least the civil sphere under Harper. There's a different rule for criminal prosecutions. I'm not aware of that, I didn't research that before today's decision. But under Harper and Reynolds' bill, it is retroactive. But I think more importantly here, we're talking about liability after Janice. The only question with respect to retroactivity indirectly is, could individuals knowingly waive their right before Janice was decided? And my answer to that question is no. Susan Fisher and Jeanette Speck could not knowingly say, I am waiving my right to stop subsidizing union speech before they even knew that right existed. And in fact, nothing on the dues deduction cards informs individuals that they have a right not to subsidize union speech. Yeah. Your argument, I just might add this, your argument is an interesting one. Certainly an interesting academic argument. But I might point out that somewhat, I don't want to, well, the absurdity perhaps of it would be that if your argument was correct, you would take it back and wipe out a boot. And you would say, even though we spoke as a Supreme Court, a boot was wrong and everything before a boot was covered by Janice. So, I just don't think that the Supreme Court's prior jurisprudence on retroactivity has to fit in on every case. And this may be a case where its implication does not quite fit. I mean, again, without regard to whether or not Janice is technically retroactive, because again, Susan Fisher and Jeanette Speck did not have pre-Janice claims. The point remains they couldn't waive their First Amendment right that was recognized in Janice before that decision and consent to dues being taken from them over their objections after Janice. And so the question can't waive a right. You can't knowingly waive a right before you know it exists. Well, you're ignoring the fact that we're doing this in the context of a contract. Contract law is a law of general applicability. Laws of general applicability don't offend the First Amendment. So, I think there's a lot of conditions precedent that need to be satisfied before we can even get to waiver. Well, New Jersey's dues deduction statute is not a law of general applicability. I'm not talking about, you were talking about the contract counsel. You weren't talking about the statute. We're talking about a waiver in the contract. And that's what I was responding to, not the statute. Well, yes. The only question... Did I just freeze? Can everyone hear me? Give yourself a second. Yes. The question though of waiver, Your Honor, is the statute at issue that's being enforced against the individuals. The only relevance of the contract is does it over their objections as a non-member. Okay. I understand what you just said. Thank you. I think we have gone well over the time. This has been a very informative discussion and helpful to the court. We thank you for participating in this somewhat unusual approach, but it has been productive. And on behalf of the panel, we wish you and your families and your friends good health and safety. And we will take the matter under advisement.